# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PHENOL CLAUDE,                    :
    Plaintiff,                  :          CIVIL ACTION NO.
                                :          3:13-cv-00535 (VLB)
v.                                :
                                :
WELLS FARGO BANK, N.A.            :          September 30, 2015
    Defendant.                  :

### MEMORANDUM OF DECISION
### DENYING PARTIES' CROSS-MOTIONS TO STRIKE [Dkts. 119, 120]
### AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. 105]

## I.   Introduction

Phenol Claude ("Claude" or "Plaintiff"), a Connecticut resident appearing *pro se*, brings this action against Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant").[1]  In his First Amended Complaint, dated August 2, 2013, Plaintiff asserted fifteen counts for fraud; mail fraud; unfair debt collection; civil conspiracy; violations of RICO, 18 U.S.C. § 1961, *et seq.*; statutory theft and conversion of funds; violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*; violations of Sections 107 and 128 of the Truth in Lending Act, 15

---

[1] Plaintiff brought his First Amended Complaint against Wells Fargo Home Mortgage, Wells Fargo Bank, N.A., "all related insurers and fiduciary bondholders," and "unnamed John Doe 1 and Jane Doe 1."  [Dkt. 10.]  However, the First Amended Complaint did not assert any claims against the related insurers and fiduciary bondholders or the unnamed John and Jane Does, and the action was dismissed as to those Defendants.  [Dkt. 85 at p. 3, n.1.]  Moreover, Wells Fargo merged with Wells Fargo Bank, N.A. in May 2004, with the sole surviving entity being Wells Fargo Bank, N.A.  [*Id.* at p. 3.]  Presently, Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A.  [*Id.*]  The present action therefore proceeds only against Wells Fargo Bank, N.A. ("Wells Fargo").

U.S.C. §§ 1606 and 1638 ("TILA"), and Sections 226.18(e), (g), and (h) and 226.22 of Regulation Z, 12 C.F.R. Part 226 ("Reg. Z"); malicious abuse of process; intentional infliction of emotional distress; trespass; failure to provide accurate TILA disclosures in the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605, *et seq.* ("RESPA"); violations of the disclosure requirements in the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 ("HOEPA"); predatory lending practice, in violation of ECOA, Connecticut TILA, TILA and Reg. Z, and RESPA; escrow shortage disclosure in violation of RESPA, 15 U.S.C. § 1691, *et seq.* 12 U.S.C. § 2605(e)(k), TILA §§ 1606 and 1638, and Reg. Z § 226.18(e), (g), and (h) and 226.22; and constitutional rights violations pursuant to 42 U.S.C. §1981(a), 1983, 1985, 2000d, *et seq.*, and the Fair Housing Act, 42 U.S.C. §§ 3601-3619 ("FHA").

Defendant moved to dismiss the First Amended Complaint in its entirety [Dkt. 27] and on August 14, 2014, this Court granted that motion in part and denied it in part, dismissing all of Plaintiff's claims except for Plaintiff's RESPA claim under § 2605 and construing an additional claim for breach of contract. [Dkt. 85 at 42–45; 53–54.]  The Court permitted Defendant to file a second motion to dismiss the newly construed claim, which Defendant submitted on October 14, 2014 [Dkt. 93] and which the Court denied on September 29, 2015 [Dkt.131].

Now before the Court is Defendant's Motion for Summary Judgment [Dkt. 105] seeking dismissal of both the breach of contract claim and the RESPA claim, and cross-motions to strike portions of the summary judgment briefings [Dkts. 119, 120].

II.     **Preliminary Matters**

A. **Plaintiff's Motion to Strike Defendant's Affidavits in Support of Summary Judgment**

After Defendant filed its Motion for Summary Judgment, which included declarations from Defendant's Vice President of Loan Documentation, Ms. Alissa Doepp ("Ms. Doepp") [Dkt. 107], and a paralegal in Defendant's attorneys' firm, Mr. William Lugo ("Mr. Lugo") [Dkt. 108], Plaintiff filed a motion to strike asking the Court to exclude evidence entered through Ms. Doepp's and Mr. Lugo's declarations as "inadmissible" pursuant to Fed. R. Civ. P. 56(e), and arguing that various paragraphs in each declaration were either hearsay, irrelevant, overly burdensome (to read) or immaterial.  [Dkt. 119.]  Defendant opposed Plaintiff's motion on the basis that Plaintiff's claims were untimely and meritless.  [Dkt. 125.]

Under Fed. R. Evid. 801, "hearsay" is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Plaintiff has not identified any specific statements, not made by the declarants themselves, that are offered for the truth of the matter asserted in either declaration.  On the contrary, the content of both declarations appears to be offered on the basis of the personal knowledge of the declarant, taken under oath.  To the extent any portions of the declarations of either declarant contain

hearsay, the Court has not considered or relied upon any such portions, as set forth in its opinion below.

As for Plaintiff's argument that certain paragraphs are immaterial or should otherwise be ignored, the Court notes that under Fed. R. Civ. P. 12(f), a court may strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from a party's pleading. However, such motions are viewed with disfavor and are infrequently granted. *See Salcer v. Envicon Equities Corp.,* 744 F.2d 935, 938 (2d Cir. 1984), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986); *see also* Wright & Miller, *Fed. Practice & Procedure* § 1380. Moreover, "a motion to strike is not an appropriate vehicle for challenging evidence presented in support of, or in opposition to a motion for summary judgment." *Wanamaker v. Town of Westport Bd. of Educ.,* 3:11CV1791 MPS WIG, 2013 WL 3816592, at *1 (D. Conn. July 22, 2013). This view was explicitly ratified by the drafters of the 2010 amendments to Rule 56(c)(2). *Id.,* citing to Fed. R. Civ. P. 56(c)(2), 2010 Amendments; *see also Cummings v. Bradley,* No. 3:11cv751, 2013 WL 1149985 (D. Conn. Mar. 19, 2013) (holding that Rule 56 does not provide for a motion to strike as a tool in the summary judgment process). "If a party wishes to argue that an asserted material fact is not supported by the evidence, that party may do so in its summary judgment briefing." *Ricci v. Destefano*, 3:04 CV 1109 JBA, 2006 WL 2666081, at *2 (D. Conn. Sept. 15, 2006). Motions to strike directed at summary judgment briefings "are unnecessary and produce only redundant statements by the court that it has not

4

relied on such inadmissible evidence in deciding the summary judgment motion." *Id.* at *3. Accordingly, Plaintiff's motion to strike is DENIED.

### B. Defendant's Motion to Strike Plaintiff's Local Rule 56(a)(2) Statement and Affidavit

Defendant also filed a Motion to Strike Plaintiff's Local Rule 56(a) Statement and accompanying affidavit, arguing that Plaintiff's Local Rule 56(a)(2) Statement failed to comply with the Local Rules and that his accompanying affidavit was "argumentative, conclusory, and . . . rife with speculation and otherwise inadmissible testimony." [Dkt. 121 at 4.] For the reasons articulated above, this motion is also denied. A party's Rule 56(a)(2) statement "is a vehicle for alerting the Court to areas of fact that are claimed to be disputed or undisputed. Striking paragraphs of the Statement provides no assistance to the Court with this endeavor." *Ricci v. Destefano*, 3:04 CV 1109 JBA, 2006 WL 2666081, at *2 (D. Conn. Sept. 15, 2006).

The *pro se* Plaintiff has failed to comply with Rule 56(a)2 of the Local Rules of Civil Procedure for the District of Connecticut, which provides that a party opposing a motion for summary judgment must file an answering document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried." D. Conn. L. Civ. R. 56(a)2. Each statement of material fact in a Local Rule 56(a) statement "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. L.

Civ. R. 56(a)3.  The Local Rule further clarifies that "[a]ll material facts set forth in [a moving party's 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party . . ."  D. Conn. L. Civ. R. 56(a)1.  Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.  *See SEC v. Global Telecom Servs. L.L.C.*, 325 F.Supp.2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, No. 3:04CV969(PCD), 2006 WL 1438649, at *4 (D. Conn. May 22, 2006).

Here, Plaintiff has failed to clearly respond to the Defendant's assertions proffered in its 56(a)1 statement, and he has also failed to provide a proper 56(a)2 statement in connection with his summary judgment opposition.  Because Plaintiff is proceeding *pro se*, the Court will liberally construe his submissions. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir. 2006) ("This policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training") (internal quotation marks and citation omitted).  However, "[t]o the extent Plaintiff has not complied with the requirements of Local Rule 56(a)2, the proper sanction would be for the Court to deem admitted Defendant's statement, not to strike Plaintiff's response."  *Wanamaker v. Town of Westport Bd. of Educ.*, 3:11CV1791 MPS WIG, 2013 WL 3816592, at *2 (D. Conn. July 22, 2013).  Ultimately,

6

> "Local Rule 56(a)1 specifically provides that a court will consider only statements supported by the evidence. Parties should assume that courts will undertake this obligation faithfully and fully review the proffered evidence of record and draw appropriate conclusions. . . . . striking a Local Rule 56(a) Statement is unnecessary since a court must not accept any aspect of a Rule 56(a) Statement that is not rooted in the evidence. . .

*Ricci v. Destefano*, 3:04 CV 1109 JBA, 2006 WL 2666081, at *3 (D. Conn. Sept. 15, 2006) (internal citations and quotations omitted).  As it always does, the Court will take as true relevant facts that are supported by admissible evidence in the record but will not credit statements or portions of statements, nor admissions of those statements, where they are unsupported by the evidence cited.  The Court will cite directly to the evidence introduced by the parties where appropriate, and will consider evidence found elsewhere in the record where such evidence assists the Court in understanding the facts of this case, or where an omission of such fact would materially alter the Court's conclusions.  Defendant's motion to strike Plaintiff's 56(a)(2) statement and accompanying affidavit is DENIED.

III.   <u>Factual Background</u>

The following facts relevant to the Defendant's Motion for Summary Judgment are undisputed in the record unless otherwise noted.

### *<u>Plaintiff's initial mortgage and subsequent modification agreement</u>*

On April 15, 2005, Plaintiff and Julia Claude (together, the "Claudes") executed a note in the principal amount of $319,000 in favor of "1-800 EAST WEST MORTGAGE COMPANY, INC" ("the Note").  [Dkt. 109 at ¶ 2.]  To secure the Claudes' repayment obligations under the Note, the Claudes granted an Open-

End Mortgage Deed ("Mortgage") in and to real estate located at 43 Tarragon Dr., East Hampton, Connecticut (the "Property") to 1-800 East West Mortgage Co.  [*Id.* at ¶ 3.]  The servicing of the Mortgage loan was first transferred to Washington Mutual, and then, on or about February 16, 2007, to Defendant Wells Fargo.  [*Id.* at ¶¶ 5–6.]  Plaintiff was qualified for a loan modification under the federal government's Home Affordable Modification Program and entered into a modification agreement with Defendant in or about December 2009.  [*Id.* at ¶ 7.]  As part of this modification agreement, an escrow account was established in order for Defendant to pay Plaintiff's future real estate tax and property insurance bills.  [*Id.* at ¶ 8.]  Beginning in 2010, Defendant sent Plaintiff annual escrow disclosure statements notifying Plaintiff of any escrow shortages, his new mortgage payment amount, and his options for restoring his required account balance.  [*Id.* at ¶¶ 9, 14.]

### *Plaintiff's 2011 bankruptcy proceeding*

In September 2011, Plaintiff filed a Voluntary Petition in the United States Bankruptcy Court for the District of Connecticut.  [*Id.* at ¶ 10.]  The bankruptcy court entered a discharge order in Plaintiff's bankruptcy case on December 14, 2011.  [*Id.* at ¶ 11.]  The Defendant represents that Plaintiff's personal liability under the Mortgage was discharged in the 2011 bankruptcy proceeding and that "Plaintiff's mortgage loan was coded from his bankruptcy as a bankruptcy loan" in Defendant's system.  [Dkt 107 at ¶ 43.]

### *The September 5, 2012 Escrow Disclosure Statement*

8

On or about September 5, 2012, Defendant sent Plaintiff its annual escrow disclosure statement.  The 2012 statement reflected an escrow shortage of $2,218.17.  The statement further stated, in relevant part:

> You may use either of the following options to restore your required account balance[:]
>
> Option 1: Pay the entire shortage now[.]  Pay the entire escrow shortage amount of $2,218.17 using the shortage payment coupon and your new monthly mortgage payment will be $1,602.81[.]
>
> Option 2: Pay the shortage over 36 months . . . . Pay the escrow account shortage of $2,218.17 in 36 payments of $61.62 which we've included in your new monthly payment amount of $1,664.43.

[Dkt. 107, Ex. J.]

On October 23, 2012, Plaintiff submitted a payment to Defendant in the amount of $2,218.17, the entire escrow shortage balance, consistent with Option 1 of the escrow statement.  [Dkt. 109 at ¶ 15.]  Plaintiff claims that he used a portion of a hardship withdrawal from his 401(k) retirement account to make this payment.  [Dkt. 108, Ex. A at 238, 241.]  Defendant admits that it received Plaintiff's payment; however, Defendant failed to credit it to Plaintiff's account and subsequently sent Plaintiff a mortgage statement indicating that his new monthly payment was $1,664.43, consistent with Option 2 of the escrow statement.  [*Id.* at ¶¶ 15–16.]  Defendant now admits that this was an error.  [*Id.* at ¶ 33.]

Having elected Option 1 and having brought the escrow account current, Plaintiff tendered $1,602.81, the amount Defendant stated was owed under Option

1, despite the fact that he received Defendant's new monthly statement stating that he owed $1,664.43.  [*Id.* at ¶ 30.]  However, because Plaintiff's $1,602.81 payment was less than the amount indicated on the monthly statement, the Defendant erroneously categorized the payment as a "partial payment insufficient to bring the loan current" and held the payment in suspense until there were sufficient funds to make the purported full payment of $1,664.43.  [*Id.* at ¶ 32.]  From November 2012 to November 2013, Plaintiff continued to make the correct monthly mortgage payments in the amount of $1,602.81, and Defendant continued to send the Plaintiff erroneous monthly statements indicating that his current monthly payment was $1,664.43 and that he had additional overdue payments as a result of his would-be partial payments.  [*Id.* at ¶¶ 16–28.]

Defendant's call logs reflect that on November 26, 2012, Plaintiff called and informed a representative of Defendant's bankruptcy department about the error in his monthly statement in which he stated that he had made a payment to cover the escrow shortage and that his monthly mortgage payment should be lowered as a result.  [*Id.* at ¶ 35.]  According to Defendant, Wells Fargo's bankruptcy department representative offered to transfer Plaintiff to the appropriate customer service department to resolve the issue but Plaintiff refused, stating that he "should not have to stay on line to make sure information is accurate and will pay whatever amount he feels is accurate in the future."  [*Id.*]  Plaintiff claims that he subsequently sent a letter to Wells Fargo on February 17, 2013 in which he expressed "concern that my credit is being damaged by [Defendant] insisting that I pay a larger some [*sic*] than otherwise indicated in the letter of stipulation that

10

was sent to me in September of 2012 in regards to my balance escrow shortage," and asking why Wells Fargo "continues to show that my mortgage is in a delinquency status". [Dkt. 15, Ex. 4.] Defendant claims its records do not reflect that any such letter was ever received by Defendant. [Dkt. 109 at ¶ 49.]

However, it is undisputed that on March 25, 2013, Plaintiff called and informed a representative of Wells Fargo about "an alleged error in his monthly statement." [Dkt. 32 at ¶ 21, referenced in Dkt. 109 at ¶ 38.] At this point, Defendant identified the error and attempted, but inexplicably failed, to rectify its error, credit the Plaintiff's escrow payment properly, retroactively treat all of Plaintiff's $1,602.81 payments as timely, adjust the balance due, or delete all related late fees and other associated charges. [Dkt. 109 at ¶¶ 39–42.] Because Defendant did not successfully correct the error, Plaintiff continued to receive monthly statements requiring payment of $1,664.43 until at least November 2013. [*Id.* at ¶ 36.] Defendant represents that on December 31, 2014, steps were again taken to correct Plaintiff's account and that as a result, "all payments after November 1, 2012 have been retroactively treated as timely" and "the balance due has been adjusted and all related late fees and charges, if any, have been deleted." [Dkt. 109 at ¶¶ 45–46.] Defendant also credited the Plaintiffs account with an additional monthly payment as a result of the servicing error. [*Id.* at ¶ 47.]

Plaintiff claims that Defendant's actions have caused him a number of different harms including damage to his credit and emotional distress in the form of a sleeping disorder. [Dkt. 116 at ¶¶ 38; Dkt. 106, Ex. A at 207–208.] However, Defendant argues that Wells Fargo "has not reported Plaintiff's loan information

11

to the Credit Reporting Agencies during any time period applicable to this lawsuit because Plaintiff's personal liability for the loan was discharged in bankruptcy in 2011." [Dkt. 109 at ¶ 48.]  Defendant also disputes Plaintiff's assertion that his sleeping disorder was caused by Defendant's purported failure to respond to his February 17, 2013 letter.  [Dkt. 109 at ¶¶ 51–53.]  Defendant further disputes Plaintiff's claim that he has suffered any actual contractual damages, because he did not overpay on his mortgage, and because Plaintiff's decision to withdraw the maximum hardship amount from his 401(k) was merely incidental to Plaintiff's mortgage shortage payment and Defendant's subsequent servicing error.  [*Id.* at ¶¶ 31; 47.]

## IV.   Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To be clear, the moving party bears the burden of proof on a motion for summary judgment, and in order to meet its burden must prove that no material factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a

12

jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

However, "[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03cv481(MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341(VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

Where the party opposing summary judgment is proceeding *pro se,* the court must read the party's pleadings liberally and interpret them to raise the strongest arguments that they suggest.  *Belpasso v. Port Authority of New York and New Jersey*, 400 Fed.Appx. 600, 601 (2d Cir. 2010).

V.    Discussion

A.  Breach of contract claim

13

Defendant contends that it is entitled to judgment as a matter of law on Plaintiff's breach of contract claim.  In support of its position, Defendant puts forth two arguments: first, that Plaintiff has failed to establish that a contract was ever formed, and second, that Plaintiff has presented no evidence that he suffered any actual damages as a result of Defendant's alleged breach.  [Dkt. 106 at 3–4.]  The Court will address each of these arguments in turn.

1.  Formation of the contract

Defendant first argues that the purported contract formed by the September 5, 2012 escrow statement fails for lack of mutual consideration.  [Dkt. 106 at 5.]  Specifically, Defendant suggests that "the escrow statement . . . did not impose any additional duties or obligations on Plaintiff.  To the contrary, his obligations remained exactly the same: He had preexisting [*sic*] duty to maintain an escrow account with enough funds for Defendant to pay his taxes and homeowner's insurance; and he also had a preexisting obligation to make the regular monthly payments pursuant to his original Mortgage and his subsequent modification agreement."  [*Id.* at 5–6.]   As a result, Defendant argues, "Wells Fargo's insistence that Plaintiff fulfill these existing obligations was not sufficient consideration to create a new contract between the parties.  Nor was it sufficient to modify the existing contract."  [*Id.* at 6.]

To form a binding and enforceable contract in Connecticut, there must be "an offer and acceptance based on a mutual understanding by the parties" which is manifested by "mutual assent between the parties." *Steinberg v. Reding,* 24 Conn. App. 212, 214 (1991).  Moreover, the contract must be definite and certain

14

as to its terms and requirements, and must be supported by valid consideration. *See L & R Realty v. Connecticut Nat'l Bank,* 53 Conn. App. 524, 534 (1999). "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Harley v. Indian Spring Land Co.,* 123 Conn.App. 800, 819 (2010).  While parties to a written contract "retain the power to alter or vary or discharge any of its provisions by a subsequent agreement," *New England Petroleum Corp. v. Groppo,* 214 Conn. 444, 450 (1990), there must be new consideration as well as mutual assent to the meaning and conditions of a modification in order for it to be enforceable.  *See Coniglio v. White,* 72 Conn.App. 236, 243 n. 5 (2002).  "Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard."  *Viera v. Cohen,* 283 Conn. 412, 442, 927 A.2d 843 (2007) (internal quotation marks omitted).  The conclusion drawn from the facts so found, *i.e.,* whether a particular set of facts constitutes consideration in the particular circumstances, is a question of law.  *Town Bank & Trust Co. v. Benson*, 176 Conn. 304, 307–308, 407 A.2d 971 (1978).

Defendant is correct that under Connecticut law, a "promise to do something which the promisor is already legally obligated to do does not constitute consideration sufficient to support a valid contract."  *Jackson v. Water Pollution Control Auth. of City of Bridgeport,* 278 Conn. 692, 707 n. 13 (2006). However, the Defendant has failed to present facts tending to show that its September 5, 2012 escrow statement was a mere reiteration of the obligations under Plaintiff's pre-existing escrow agreement with Defendant.  The Defendant

15

does not cite the terms of an underlying loan agreement, but rather the escrow payment statement.  Under the original Loan Modification Agreement Plaintiff was required to maintain an escrow account under which, "[o]n *a monthly basis*, along with your principal and interest payment, *you will be making a monthly escrow deposit* which will equal 1/12th of your annual escrowed bills.  In turn, [Wells Fargo] will be paying your future real estate tax and property insurance bills, and if applicable, other fees or assessments related to the property."  [Dkt. 107, Ex. G (emphasis added).]  The September 5, 2012 escrow statement, by contrast, includes the option of making a lump-sum catch-up escrow payment and obtaining a lowered monthly payment that does not include the aforementioned escrow deposit.  [Dkt 107, Ex J.]  Defendant has produced no evidence suggesting that the original contract included such an option.

Based on this record, a jury could conclude that the option to qualify for a lowered future monthly payment in exchange for a guaranteed lump sum payment and the accompanying time value of that payment constituted a new term for which the parties had not previously contracted.  New terms that vary the timing and manner by which payment is made may be sufficient to establish a new enforceable contract under Connecticut law.  *See, e.g., Alarmax Distributors, Inc. v. New Canaan Alarm Co., Inc.*, 61 A.3d 1142, 1150 (Conn. App. 2013) (affirming trial court's determination that the parties had legally modified their original agreement by not adhering to the thirty day payment term in the credit agreement but instead maintaining an open, running account where the defendant made periodic, lump sum payments toward the balance of the

16

account).[2]  Moreover, Plaintiff accepted Defendant's offer to accept and did pay the lump sum to extinguish the escrow account deficiency and Defendant accepted that payment as it promised.  Accordingly, the Defendant is not entitled to summary judgment in its favor on this basis.

Defendant also argues that the 2012 escrow statement fails as a contract because Plaintiff cannot establish that there was a "meeting of the minds" regarding whether or not the escrow statement was an offer to enter into a contract.  [Dkt. 106 at 7.]  Defendant points to language in the escrow statement that states the notice is "for informational purpose [*sic*] only and is being provided as a courtesy should you voluntarily decide to make any escrow shortage payment, if applicable."  [Dkt. 106 at 8.]  Based on this language, Defendant contends that "it was not reasonable for Plaintiff to believe that the escrow statement was an offer to which his assent would conclude a new bargain," and claims that no reasonable fact finder could find otherwise because

_____

**[2] Defendant's reliance on the principle that "when a party agrees to perform an obligation for another to whom that obligation is already owed, although for lesser remuneration, the second agreement does not constitute a valid, binding contract" is inapposite.  [Dkt. 106 at 6, n. 4, citing *New Eng. Rock Services, Inc. v. Empire Paving, Inc.*, 731 A.2d 784, 787 (Conn. App. 1999).]  It is undisputed that Defendant's September 5, 2012 communication did not alter Plaintiff's obligation to pay in full the total amount he owed under his existing mortgage agreement. Rather, the question at issue is whether the letter offered Plaintiff a new mode and manner by which to make those payments, such that upon its acceptance, Defendant was obligated to do "something further than, or different from, that which [it was] already bound to do."  *New Eng. Rock Services, Inc.*, 731 A.2d at 787.**

the sole document on which Plaintiff relies "neither expresses nor implies any intent on the part of Wells Fargo to create a new contract or modify an existing contract." [*Id.*]

"Whether and on what terms a contractual commitment has been undertaken are ultimately questions of fact for the trier of facts." *LeBlanc v. New Eng. Raceway, LLC*, 976 A.2d 750, 762 (Conn. App. 2009) (citation omitted). Because there is a genuine dispute between the parties as to whether the letter constituted an offer, summary judgment is not appropriate. The case cited by Defendant is inapposite. There, as Defendant points out, the court held that the agreement at issue did not constitute an offer as a matter of law because the terms were not sufficiently specific. *Retrofit Partners I, L.P. v. Lucas Industries, Inc.*, 47 F. Supp. 2d 256, 262–63 (D. Conn. 1999) *aff'd,* 201 F.3d 155 (2d Cir. 2000). By contrast, here the options set forth in the escrow statement were adequately detailed such that "unqualified acceptance will definitely fix the rights of the parties." *Retrofit Partners*, 47 F. Supp. 2d at 262 (citation omitted). Indeed, the escrow statement lays forth language that suggests an offer to enter into a unilateral contract: "The escrow disclosure indicates a shortage of $2,218.17. We have spread this amount over the next 36 months and included it in the new monthly payment. However, any voluntary decision to pay the shortage in full *will reduce the monthly payment to $1,602.81.*" [Dkt. 107, Ex J, emphasis added.] In this context, the finder of fact could determine that, as Plaintiff contends, the escrow agreement was an offer to which Plaintiff manifested his acceptance by submitting his lump sum payment of $2,218.17. Moreover, a jury could

18

reasonably find that Defendant's receipt and deposit of that payment represented acceptance constituting the undertaking of its commitment to lower Plaintiff's future monthly payment to $1,602.81.  [Dkt. 116-3 at 29.]  Accordingly, summary judgment cannot lie.

### 2. Damages

Defendant also reiterates its argument, first put forth in its second motion to dismiss, that Plaintiff's breach of contract claim must be dismissed as a matter of law because Plaintiff cannot demonstrate that he suffered any actual damages from Defendant's purported breach.  The Court has already addressed this issue.  To reiterate, the Court ruled that under Connecticut law, Defendant can be held liable for breach of contract without regard to whether Plaintiff proves actual damages, and thus Defendant is not entitled to summary judgment on the ground that Plaintiff has not demonstrated those damages.  *Izzo v. Moore Wallace N.A., Inc.,* 3:08-CV-00163 DJS, 2011 WL 1874963, at *3 (D. Conn. May 17, 2011).

In sum, Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim is DENIED.

### B.  RESPA claim

Defendant also argues that it is entitled to judgment as a matter of law on Plaintiff's claim that Defendant violated Section 2605(e) of RESPA, which requires servicers of "federally related mortgage loan[s]" to respond in a prescribed time and manner to qualified written requests ("QWRs") from borrowers, and provides

a private cause of action for violations of the statute.  12 U.S.C. §§ 2605(e)-(f).  In support of its position, Defendant argues that Plaintiff cannot prove that Wells Fargo received the February 17, 2013 QWR in which Plaintiff requested information about Defendant's failure to credit his escrow shortage payment. [Dkt. 106 at 15.]  Next, Defendant contends that Plaintiff cannot prove that he suffered any actual damages from Defendant's alleged failure to respond to this QWR. [*Id.* at 15–18.]

### 1. Proof of receipt

In order to be subject to the RESPA requirements for responding to a QWR, the party in question must have actually received it.  *See, e.g., Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 293 (N.D.N.Y. 2008), *aff'd,* 421 Fed. Appx. 97 (2d Cir. 2011).  Defendant argues that because it does not have any record of receiving Plaintiff's February 17, 2013 letter, and Plaintiff cannot prove that Defendant received it, it is entitled to summary judgment on Plaintiff's RESPA claim.  [Dkt. 106 at 15.]  Although Plaintiff has the ultimate burden of proof on this issue, Defendant's position on summary judgment misapprehends the standard for receipt.  Under the so-called "mailbox rule," a letter shown to be properly addressed and mailed raises a rebuttable presumption of receipt.  *See, e.g., In re Residential Capital, LLC*, 533 B.R. 874, 879 (Bankr. S.D.N.Y. 2015) (internal quotation marks and citations omitted).  Plaintiff has represented that he sent a letter to Wells Fargo on February 17, 2013, and in support of this assertion he has produced a letter bearing that date and addressed to Wells Fargo at the same address to which later QWRs were sent and received responses.  [Dkt. 10 at

20

¶ 17; Dkt. 15, Ex. 4; *cf.* Dkt. 107, Exs. JJ and LL.]  In response, Defendant has offered two documents showing that it answered Plaintiff's later QWRs.  [Dkt. 107, Exs. KK and MM.]  This is insufficient to rebut the presumption of receipt.  *See In re Residential Capital*, 533 B.R. at 879 (finding that an absence of a corresponding entry in loan servicing notes that included entries for all other written communications from the plaintiff was insufficient to rebut the presumption that the defendant had received the missing letter); *cf. Hogarth v. N.Y. City Health and Hosps. Corp.,* 2000 WL 375242 (S.D.N.Y. Apr. 12, 2000) (finding that defendants had successfully rebutted presumption that a letter was delivered by clearly establishing use of detailed logs of incoming and outgoing mail that contained no record of the letter).  Accordingly, a genuine material question remains as to whether the presumption holds and Defendant received Plaintiff's February 17, 2013 QWR, and summary judgment on this basis must be denied.

### 2. Damages

Defendant also argues that Plaintiff's claim fails because he cannot prove he suffered any cognizable damages resulting specifically from Defendant's alleged RESPA violation.  [Dkt. 106 at 15.]  "A plaintiff bringing a [RESPA] § 2605 claim must sufficiently allege one of two types of damages: (1) 'actual damages to the borrower as a result of the failure' to comply with § 2605; or (2) statutory damages 'in the case of a pattern or practice of noncompliance with the requirements' of § 2605."  *Gorbaty v. Wells Fargo Bank, N.A.*, Nos. 10-cv-3291, 10-cv-3354, 2012 WL 1372260, at *3 (E.D.N.Y. Apr. 18, 2012) (quoting 12 U.S.C. §

2605(f)).  It is undisputed that Plaintiff is seeking only the former type of damages, and as such, to survive summary judgment he must show actual damage caused by Defendant's failure to provide information in response to his QWR.  *Roth v. CitiMortgage Inc.*, 12-CV-2446 SJF WDW, 2013 WL 5205775, at *8 (E.D.N.Y. Sept. 11, 2013) *aff'd,* 756 F.3d 178 (2d Cir. 2014).

In its Order on Defendant's first motion to dismiss, this Court found that Plaintiff had adequately pled damages under RESPA in the form of a sleeping disorder and harm to his credit.  [Dkt. 85 at 45.]  Defendant now maintains that Plaintiff cannot adequately establish a causal link between his sleeping disorder and Defendant's failure to respond to his QWR.  In support of this position, Defendant points to deposition testimony by Plaintiff in which he attributed his inability to sleep "mostly to my disbelief about what was happening with my mortgage.  And on top of it the many calls I placed with the defendant and noticed that things were not – still not being fixed" as well as to "[n]ot knowing what's going on, when this would end."  [Dkt. 108, Ex. A at 207–208.]  Defendant also points to testimony by Plaintiff's mental health counselor, Jeanne Amenta ("Ms. Amenta") in which she stated that she was treating Plaintiff to "help him with the stress he was feeling about his lawsuit" and that she believed he was "fixated on the lawsuit."  [Dkt 113 at 41; 46.]  Defendant argues that this testimony establishes that Plaintiff's sleeping disorder was "related to his decision to represent himself as a *pro se* plaintiff in this instant action," rather than Defendant's failure to respond to the QWR.

22

However, the Court does not believe it can resolve the issue of causation as a matter of law on the record before it.  The statements by Plaintiff to which Defendant cites are not so unambiguous that a jury could not decide they refer to stress precipitated by Defendant's failure to provide information, rather than the subsequent lawsuit.  Moreover, although the portion of Ms. Amenta's testimony cited by Defendant does suggest she believed Plaintiff's inability to sleep was a product of the ongoing lawsuit, Plaintiff has testified that he had been unable to sleep for over a year before seeking Ms. Amenta's help, a time which predates the lawsuit.  [Dkt. 106, Ex. A at 207.]

Further, other evidence in the record not cited by the Defendant refutes Defendant's contention that Plaintiff's anxiety was related only to the litigation and not to its longstanding and persistent mishandling of mortgage.  In other portions of Ms. Amenta's testimony, Ms. Amenta characterizes the relationship between the lawsuit and Plaintiff's sleeping disorder differently, saying, "the *escrow problem* seemed to be a precipitant of him having [emotional] difficulty, which *eventually* led to the lawsuit."  [Dkt. 113 at 64, emphasis added.]  Similarly, in response to a question by Defendant's counsel regarding whether Plaintiff was seeking treatment for stress related to his self-representation, Ms. Amenta answered:

> A. That would be a big piece of it.
>
> Q. And what would be the other piece.
>
> A. The fact that it just exists, the fact that it happened at all, that it went from being a billing dispute to what he felt needed to be a lawsuit.

23

[Dkt. 113 at 69.]  Similarly, in response to defense counsel's question about "what it is about this situation that's really thrown him," Ms. Amenta responded that "[i]t seems as though because he felt like it was a simple mistake in the beginning that somehow was not able to get cleared up and it just mushroomed into something that shouldn't have happened."  [Dkt. 113 at 49.]  Considering the record as a whole, a reasonable fact finder could find that the distinction between Plaintiff's distress over not being able to obtain information from Defendant, and Plaintiff's distress over the lawsuit he initiated because he could not get information from Defendant, is immaterial.

Defendant also argues that Plaintiff could not have suffered any damage to his credit as a result of Defendant's failure to respond to his QWR because "Plaintiff's loan has not been reported to the Credit Reporting Agencies during the time period at issue in this suit."  [Dkt. 106 at 18.]  In support of this assertion, Defendant produced clean credit reports from Experian, Transunion, and Equifax. [Dkt 104 at ¶¶ 49–51, Exs. GG, HH, II.]  However, the reports were generated on January 16, 2015, which is after Defendant states that it was finally able to successfully credit Plaintiff's payments as timely and delete any late fees and charges.  [Dkt. 107 at ¶ 46.]  Moreover, Plaintiff points to a November 2013 affidavit submitted by Defendant in which Ms. Doepp testified that "Wells Fargo instructed the Credit Reporting Agencies to whom Wells Fargo furnishes information concerning Plaintiff's account to modify the reporting for Plaintiff's account by deleting all late payment information for the period of November 1,

2012 until the present." [Dkt 32 at ¶ 24.] Defendant then later issued a "Notice of Factual Error" retracting portions of Ms. Doepp's November 2013 affidavit and representing that, in fact, "Wells Fargo has not reported on the status of [Plaintiff's] account to the credit reporting agencies during any of these events. A bankruptcy hold had been placed on [Plaintiff's] account – therefore, Wells Fargo did not report Mr. Claude late to the credit reporting agencies." [Dkt. 104 at 2.] At best, this indicates that Ms. Doepp initially testified to having personal knowledge of events that never occurred. Meanwhile, Plaintiff has produced a loan information report that appears to include credit reporting history that postdates Plaintiff's 2011 bankruptcy filing. [Dkt. 116, Ex. 1 at 6.][3] Plaintiff has also produced an October 4, 2013 letter from his mortgage insurer, United Guaranty, which states that it has been notified that Plaintiff's mortgage has been reported as delinquent. [Dkt. 116, Ex. 11.] In addition, as Mr. Claude and his wife constitute an economic unit, misreporting the mortgage as delinquent on Mrs. Claude's credit report when in fact it was current would have an adverse effect on Mr. Claude's creditworthiness. *See Koropoulos v. The Credit Bureau, Inc.*, 734 F.2d 37 (D.C.Cir. 1984) (credit reporting agency "should not be shielded from

_____

[3] Defendant addressed this document in its reply brief by stating without elaboration that the loan information report references both Mr. Claude and Julia Claude, and that the relevant section of the document "does not identify whether it contains information related to Plaintiff, Julia Claude, or both parties." [Dkt. 123 at ¶ 4.] Defendant then simply reiterates that "Wells Fargo has not reported Phenol Claude's information to the credit reporting agencies during any time period applicable to this lawsuit because his personal liability for the loan was discharged in bankruptcy in 2011." [*Id.*]

liability because a consumer was harmed by the negligent disclosure of a credit report of another person rather than their own credit report"); *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 212 (D. Conn. 2013)(provision of father's credit report in response to request for son's report could constitute FCRA violation); *Roybal v. Equifax*, No.2;05-cv-01207, 2008 WL4532447 at *6 (E.D. Cal. Oct. 9, 2008)(wife had standing to bring claims under FCRA based on erroneous adverse information in husband's credit report).

Moreover, it is unclear from the record whether Plaintiff's mortgage was subsequently reaffirmed.  Defendant states only that "[o]n or about November 14, 2012, Wells Fargo sent Plaintiff's attorney a reaffirmation agreement," and submitted an unsigned copy of this agreement.  [Dkt. 107, Ex. P.]  However, even assuming Plaintiff's personal debt on the mortgage was discharged and not reaffirmed, this is not dispositive proof, especially given Defendant's admitted history of errors, that Defendant did not mistakenly report Plaintiff to credit reporting agencies regardless of his bankruptcy status.  Taken as a whole, and considering Plaintiff's *pro se* position, the Court believes that the discrepancies in the record on this point create a genuine dispute of fact appropriate for trial.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's RESPA claim is DENIED.

VI.   Conclusion

For the foregoing reasons, the Defendant's [Dkt. 105] Motion for Summary Judgment is DENIED.  The Parties' cross-motions to strike [Dkts. 119, 120] are also DENIED.

26

**IT IS SO ORDERED.**


_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 30, 2015**